## THOMAS RILEY *v.* THE STATE.

1. CONFESSIONS. — In important criminal trials, if the prosecution resorts to confessions of the accused as evidence against him, great care should be exercised lest, either in the mode of obtaining the confession or in the use made of it, injustice be done the accused.

2. SAME. — The entire statement of the accused, embodying the confession or admission relied on, goes to the jury; but they are not bound to give

equal credence to all portions of the statement. What parts of it they will believe it is for them to determine, in view of all the circumstances of the case.

3. MURDER.—Note in the opinion a recapitulation of evidence held sufficient to sustain a conviction for murder in the first degree.

APPEAL from the District Court of Jack. Tried below before the Hon. J. R. FLEMING.

The case is amply and clearly stated in the opinion. The homicide having been committed while the Constitution of 1869 was in force, the jury saw fit to exercise the power it conferred on them, to substitute the penitentiary for life in lieu of the death penalty.

No brief for the appellant.

*George McCormick*, Assistant Attorney-General, for the State.

ECTOR, P. J.   This was a joint indictment against Daniel Donovan and Thomas Riley, the appellant, for the murder of one P. McPeak, on March 26, 1876. On the application of the district attorney, a *nolle prosequi* was entered by the court as to the defendant Donovan. At the November term of the court the defendant Riley was tried and convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life.

The only question raised in the motion for new trial is as to the sufficiency of the evidence to support the judgment. The defendant is not represented in this court by counsel. There are no assignments of error. We have given the record a most searching examination, in order to ascertain whether the defendant has had a fair and impartial trial. The evidence in the case, with one exception, is entirely circumstantial.

That the deceased, P. McPeak, came to his death by violence is, we think, most conclusively shown by the evidence.

It appears from the statement of facts that Daniel Donovan kept a restaurant in a building in the town. of Jacksboro, Jack County, and that Thomas Riley and P. McPeak were employed by him. · Riley and McPeak worked about the restaurant, and usually slept there.  Donovan and wife staid about the restaurant until after supper, but slept in a different building.  On the morning of March 25, 1876, the dead body of McPeak was found lying in an alley in rear of the restaurant.  He was lying on his face.  He looked as if he had been carried to the spot by some person or persons, after he had been killed, and thrown down there. He had only one wound on his body ; he had been stabbed on the left side of the neck, just above the collar bone ; the wound ranged downward in the breast, and had caused his death.  There was a pathway from the restaurant to the alley where the body was found ; this pathway went through a gate some thirty steps from the back door of the restaurant, and ran on the south side of a cistern at the back of said building.  There was some blood on the ground where the body was found ; drops of blood were traced on the ground back to within ten feet of the back door of the restaurant, and here, right in the path leading from the restaurant to where the body was found, and close to the cistern, in rear of said building, was found a large pool of blood.  The blood was fresh, and the body had the appearance of having been dead about two hours.

A short time before the killing there had been a rain, and near the gate spoken of there was a muddy place, in which were found tracks, all made by the same person, going from the restaurant in the direction of the place where the dead body was found: The witness Duke, who occupied and slept in the adjoining building, testified that he heard no unusual noise that night ; that after the dead body of McPeak was found he sent for Williams, a justice of the peace, and they examined the ground and sent into the house for Riley.

He says: "We pulled Riley's boot off of his foot and placed it in the track, and it fit exactly. We took the right boot; it was half-soled, and run down or turned over some; the track was made by that kind of a boot. At this muddy place, near the gate, there was a dry path running on each side of the same. The toes of the tracks were twisted towards the gate, going from the inside of the fence to the outside through the gate, as if going from the restaurant to where the body was found. We examined Riley's boots that he had on, and found spots of blood on them. I saw Riley, Donovan, and McPeak at the restaurant at eleven o'clock on the night McPeak was killed; they were all there together. McPeak was very drunk. After I got my supper, and just as I was closing my saloon door, at about half-past eleven o'clock, Donovan and Riley came in and took a drink, and went out. McPeak had been drinking that day; he was known and regarded as a quiet, peaceable man in the community where he lived; never knew of his being in a quarrel. He had only one shoe on when we found him dead. I examined the body, and found no knife on the body of McPeak, or other weapons. * * * Some blood was found inside the restaurant, in the back room, on the ground; but Riley had been cutting up liver that morning. There was no floor in this room. No blood was seen on Riley's person, except on his boots. Riley did not come out to where the dead body was when we all gathered there, and I did not hear him say anything about the occurrence; said nothing when we pulled off his boots. He was in the restaurant; saw him at the back door and around the cistern that morning."

Judge Williams' testimony differed in no material respect from that of the witness Duke. In speaking of the boot or shoe track seen in the mud, he says: "It was made with a boot or shoe that was half-soled. It all showed that the boot or shoe had round-headed tacks in the bottom, mechan-

ically arranged. The print of the tacks appeared in the bottom of the track. The right boot track seemed to have been made by a boot or shoe turned over some. I took Riley's boot off of his right foot and placed the same in the track. It compared as near with the tracks as it was possible for it to compare. The boot was half-soled, and had round-headed tacks in the bottom, mechanically arranged. The boot was turned over some,. as the track showed in the mud. I found a puddle of blood near the cistern, in the path, a few steps from the back door of Donovan's restaurant. I saw drops of blood along between the body and the gate, and I think, from all the circumstances, that McPeak had been killed and carried there. Did not see Riley at the body. * * * There was some blood in the restaurant, and it had the appearance of being fresh. There was a liver hanging on the wall. Don't know when it was brought.''

Fresh blood was also on the gate-post in rear of the house, where the tracks were discovered. A shirt with some blood on it was found in the back room of the restaurant, in a box, under a rock, by the witness Mabry, who says : '' The shirt was wet, and seemed as if it had just been washed and wrung out.'' The witness Adair identified the shirt as one he had seen Riley have on the day previous to the killing.

The defendant introduced Mrs. Donovan, who testified that the shirt found in the box was not the one worn by Riley at the time referred to by the witness Adair; that some days before the killing she saw a shirt like the one in court put over some salt pork in a box in the back room of the restaurant, and a rock put on it. The shirt was put over the meat to keep the cats off of it. She further testified that sometimes they killed chickens in the back yard, but more frequently in the back room of the restaurant. Jane and Henry Gibson saw the shirt exhibited in court, and testified that she, Jane, some two or three weeks before

McPeak's death, had washed a shirt like it for McPeak. The defendant, Riley, made his escape from jail, and was re-arrested in Kansas by the sheriff of Jack County.

Defendant proved that the liver hanging up in the back room of the restaurant was carried there on the morning of the 26th, and taken in at the front door.

John Stoneman testified as follows: "I know the defendant. I came to this county twelve years ago, with the Sixth United States Cavalry. We both belonged to that regiment. I saw the defendant after McPeak was killed. I live about eight or nine miles north-west of Jacksboro. He had at the time just escaped from the jail of Jacksboro. I met him in the woods, and had a conversation with him at this time. He said: 'John, I had to kill McPeak to keep him from killing me.' That is the substance of our conversation," etc.

The charge of the court is alike distinguished for its fairness and its ability. It is a correct enunciation of the law of the case, and instructed the jury fully in respect to all the points arising upon the evidence. The court charged the jury upon the question of murder in the first and second degrees, on manslaughter, and defined both express and implied malice, and gave the defendant the benefit of a charge on a reasonable doubt as between the degrees of the offense, and also charged upon the law of self-defense.

On the question as to the sufficiency of circumstantial evidence to convict, the court instructed the jury as follows:

"The jury are further charged that all the testimony introduced in this case, except the alleged confessions of the defendant, is circumstantial, so far as it concerns the question whether the alleged killing was committed by the prisoner or by some other person; and you are charged that, in order to find the prisoner guilty on circumstantial evidence, it is essential that the proof be not only consistent with the prisoner's guilt, but inconsistent with any other

rational conclusion or reasonable hypothesis consistent with the circumstances and facts proven.

" What circumstances will amount to proof can never be matter of general definition. The legal test is the sufficiency of the evidence to satisfy the understanding and conscience of the jury. On the other hand, the jury ought not to condemn unless the evidence excludes from their minds all reasonable doubt of the guilt of the accused."

The court, after instructing the jury as to the law of the case, left them perfectly free and untrammeled to pass upon the credibility of each witness, and to determine for themselves the weight to be given to the evidence. In important criminal trials, when the prosecution resorts to the confessions of the accused as evidence against him, great care should be exercised by the court lest, either in the mode of obtaining the confession or the use made of it, injustice be done to the accused. His whole statement, embodying the admissions or confessions, should be taken together. The jury are, however, not bound to give equal credit to the whole statement, but it is for them to decide how much of it, under all the circumstances of the case, they will believe. The confessions of the defendant, which were used against him, appear to have been freely made, without compulsion or persuasion, and when he was in no way restrained of his liberty. There is no evidence in the case pointing to any person other than the defendant as the guilty party.

We believe that the evidence conclusively shows that McPeak was murdered by the defendant; that the circumstances surrounding the defendant point, beyond any other reasonable solution, to his guilt. We have examined the testimony, and, in fact, the entire record, with great care, and we are satisfied that a proper administration of the law demands, and a due regard to the interest of society requires, that the judgment of the lower court should not be disturbed. It is, therefore, affirmed.

*Affirmed.*